**Grayce E. COROLLO, Appellee,**

v.

**S. S. KRESGE COMPANY, d/b/a K-Mart, Appellant.**

**Nos. 71-1319, 71-1320.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1971.

Decided March 6, 1972.

grounds for reversal that there was insufficient evidence of negligence to be submitted to the jury and that in any event plaintiff was guilty of contributory negligence as a matter of law. We agree with the District Court that these questions were properly left for jury determination, but we find merit in defendant's affirmative defense that at the time of the accident the plaintiff was a "statutory employee" of defendant and as such was limited to the rights and remedies accorded covered employees under the workmen's compensation laws of South Carolina. The decisions of that state which govern here have led us to conclude that the judgment should be reversed and the action dismissed.

In a cross-appeal plaintiff contends that the jury awarded inadequate damages, and she seeks a new trial on this issue alone. In view of our conclusion on the workmen's compensation issue consideration of this contention becomes unnecessary.[1]

The defendant S. S. Kresge Company owns and operates a large chain of "discount department stores" throughout the United States and in some foreign countries using the trade name "K–Mart"[2], and henceforth we will refer to the defendant as K–Mart. At the time of plaintiff's accident there were 88 stores in the chain, and the plaintiff had been employed by K–Mart in the lingerie department at the time its Columbia store was opened in 1963. There were 40 or more different departments in this store about eight of which were licensed by K–Mart to various specialty merchandisers. In 85 of the K–Mart stores, including the one in Columbia, the millinery departments were licensed to Benjamin Kraft & Sons, Inc. (hereafter

George E. Lewis, Columbia, S. C. (Turner, Padget, Graham & Laney, Columbia, S. C., on brief), for appellant.

Henry Hammer, Columbia, S. C. (Roy A. Powell, Columbia, S. C., on brief), for appellee.

Before CRAVEN and BUTZNER, Circuit Judges, and DUPREE, District Judge.

DUPREE, District Judge:

In this diversity action plaintiff obtained a $20,000 jury verdict for personal injuries sustained in a slip-and-fall accident which occurred in defendant's department store in Columbia, South Carolina. On appeal defendant urges as

1. The case was actually tried twice. In the first trial the jury awarded $10,000. This was set aside as "grossly inadequate" by Judge Martin who ordered a new trial on the negligence and damages issues only. On plaintiff's motion made at the close of defendant's evidence he had stricken defendant's further defense based on the Workmen's Compensation Act. The second trial resulting in the $20,000 verdict was before Judge Russell who declined to disturb the verdict. This appeal followed.

2. In addition to its K–Mart division Kresge has two other divisions, Kresge and Jupiter stores, which are described as "variety discount stores". In this opinion we will be concerned only with the K–Mart division of the chain.

"Kraft"). Because of space limitations the remaining three K–Mart stores did not have millinery departments.

With the view to obtaining more convenient working hours for herself the plaintiff resigned her position with K–Mart and obtained employment by Kraft to fill a position which became open in its licensed millinery department. She was so employed by Kraft on the morning of August 4, 1964, when shortly after her arrival at the K–Mart store for work she slipped and fell at a place in a hallway where K–Mart's janitor had failed to mop up some soapy water which he had been using in cleaning the floor in the hallway. Although the plaintiff was familiar with the custom of the janitor to clean and mop this hallway daily, he had not been known to leave soapy water on the floor on any previous occasion, and as plaintiff had just turned a corner when this happened, she did not see the hazard in time to avoid it. As a result of her fall the plaintiff sustained painful and perhaps permanently-disabling injuries.

The store building in which this occurred contained approximately 94,000 square feet all under one roof. The area within the store is completely open, and Kraft and the other licensees of departments are allotted space in the store. The store is opened each morning and closed each evening by K–Mart employees, and no one else has authority to open or close the store. The various licensee departments cannot operate except during K–Mart's established hours. All counters, display cases and store fixtures used by the licensed departments are furnished by K–Mart and are the same kind and appearance as those used by K–Mart in its own departments. There are no partitions separating the licensed departments from those of K–Mart.

All persons who worked in the store wore badges which identified them as K–Mart employees. While the plaintiff was directly employed by K–Mart her badge contained a number and her name. After she was employed by Kraft in addition to her name the badge contained the words "Millinery Department Supervisor". There was no sign in or about the business indicating that Kraft was the licensee of the millinery department, and neither plaintiff nor Kraft's other employee in the store handled any money. Instead, tickets were written for sales made in the millinery department, and as in the case of all sales made by any department in the store, payment was made at a checkout counter where a number of cash registers, all owned and operated by K–Mart, were located. Separate key designators on the cash registers enabled the cashiers to segregate the money of K–Mart from that of the various licensees as it was taken in. K–Mart accounted directly to Kraft's home office for the proceeds of Kraft's sales.

The written agreement between K–Mart and Kraft was contained in a document entitled "K–Mart License Agreement", apparently a standard form contract used by K–Mart with all its licensees. Kraft's agreement, dated March 19, 1963, was for the operation of "a department for the sale of certain merchandise described and classified as follows: millinery and handbags". The essential terms of the agreement are set forth in the margin.[3]

3. 1. Term. One year with automatic renewal subject to right of either party to terminate on three months' written notice.
   2. Area to be occupied by Kraft. To be mutually agreed upon but with right of K–Mart to change the location and right of Kraft to terminate upon thirty days' written notice if not satisfied with the relocation.
   3. License fees. A percentage of Kraft's gross sales subject to a minimum annual fee at the rate of $4.50 per square foot of Kraft's selling space.
   4. Kraft to comply with all laws applicable to its operation and furnish evidence of compliance with workmen's compensation and other disability laws.
   5. Furniture and fixtures to be furnished by K–Mart.
   6. Cash registers to be furnished by K–Mart.

Kraft had less than fifteen employees and was therefore not required by law to carry workmen's compensation insurance. In compliance with its agreement with K–Mart, however, Kraft did carry such insurance. K–Mart carried its own workmen's compensation insurance. Plaintiff made claim and was paid workmen's compensation benefits by Kraft's carrier. Any recovery by plaintiff in this common law action would inure by subrogation to Kraft's carrier to the extent of such benefits paid.

Title 72, South Carolina Code of Laws for 1962, Section 111, provides:

"When any person, in this section and §§ 72–112 and 72–114 referred to as 'owner', undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and §§ 72–113 to 72–116 referred to as 'subcontractor') for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this Title which he would have been liable

7. Utilities to be furnished by K–Mart.

8. Telephones. "The licensor shall provide at its expense telephone service and facilities for incoming calls under the general listing of K–Mart. The licensee may provide additional telephone service under a separate listing identifying its department under the name of K–Mart."

9. Use of name. "The licensee shall conduct its sales on the premises solely under the name of K–Mart. The licensee, however, may neither pledge the credit, incur any obligation or liability, hire any employees, nor purchase any merchandise or services under the name of the licensor or K–Mart, it being understood that neither party to this agreement shall act as the agent, servant or employer of the other party."

10. Rules and regulations. K–Mart retains right to establish uniform rules and regulations with which licensee agrees to comply governing but not limited to "the order and appearance of the store, methods for handling of cash and cash registers, credit, will-call and lay-away sales, payments made by licensor for account of licensee, refunds, pricing policies, inventory requirements, disposal of old merchandise, overlap in merchandise carried by various licensees, products liability insurance, employment practices, personnel and store policies, receiving of merchandise and store security."

11. Assignment of license prohibited without consent of licensor.

12. Janitor and security service to be provided by K–Mart except in Kraft's storage area.

13. Advertising. All under sole and exclusive control of K–Mart. Kraft to pay two per cent of its gross sales for advertising to be included in K–Mart ads.

14. Merchandise. Kraft's sales limited to millinery and handbags.

15. Indemnification. Kraft to hold K–Mart harmless from claims and litigation arising out of patents, trade marks, copyrights, labeling, unfair competition and products liability.

16. Records. Kraft's records to be kept in accordance with established accounting practices with right of audit in K–Mart.

17. Credit sales. Kraft to use K–Mart's "Thrifty Charge Plan" and not to use other credit facilities.

18. Memberships in trade organizations and charitable contributions. K–Mart to establish common standards and Kraft to bear "its proper share of the cost and obligation of such activities."

19. Risk of loss or damage to property "shall as between licensor and licensee be exclusively that of the party having title to such property."

20. K–Mart to provide comprehensive general liability policy insuring K–Mart and Kraft with Kraft paying its pro rata part of premium.

21. Termination of license. K–Mart may terminate in event of condemnation of property, failure of Kraft's sales to total $45 per square foot of space occupied for twelve consecutive months, failure of Kraft to comply with K–Mart's established rules and regulations or Kraft's bankruptcy.

22. Rights and remedies. Stated rights and remedies not exclusive but cumulative and in addition to those allowed by law. Agreement to be construed under Michigan law and "the parties do not intend this agreement to constitute a joint venture, partnership, or lease and nothing herein shall be construed to create such a relationship."

to pay if the workman had been immediately employed by him."

Title 72, Section 121, of the same Code, provides as follows:

The rights and remedies granted by this Title to an employee when he and his employer have accepted the provisions of this Title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents, or next of kin as against his employer, at common law or otherwise, on account of such injury, loss of service or death."

Since we hold that defendant was not entitled to a directed verdict on the negligence issues, the only remaining question for decision is whether under the undisputed facts the South Carolina workmen's compensation laws constituted a bar to the maintenance of this common law tort action in the District Court. K–Mart contends that it was an "owner" and that the millinery department in its store was operated by Kraft as a subcontractor within the purview of Section 72–111 of the South Carolina Code quoted above; that plaintiff was therefore a "statutory employee" of K–Mart; and that as such she was limited to the exclusive remedy of the Workmen's Compensation Act as provided by Section 72–121 of the Code. We agree.

Plaintiff alleged in her complaint that the defendant was "engaged in the business of distributing and selling at retail divers goods and merchandise" and "that on or about August 4, 1964, the defendant in the course of its business was the owner, in control of and maintained a large retail merchandising establishment known as K–Mart on Jackson Boulevard in the City of Columbia, Richland County, South Carolina, in which were certain licensed departments, including the millinery department leased by Benjamin Kraft & Sons." These allegations were admitted by the defendant. That K–Mart was a department store in the ordinary sense of the term is not open to question.[4] That the agreement with Kraft for the operation of the millinery department did not remove that department from the scope of K–Mart's "trade, business or occupation" as those terms are used in the statute is equally clear.

We think the decision of the South Carolina Supreme Court in Adams v. Davison-Paxon Company, 230 S.C. 532, 96 S.E.2d 566 (1957) is indistinguishable and that it controls decision here.

In that case the Davison Company operated "a general retail department store" which included departments of men's and ladies' ready-to-wear, shoes, hats, etc., but its ladies' hat department was operated by Emporium World Millinery Company under a contract very similar in its terms to the license agreement between K–Mart and Kraft in this case. For instance, the space occupied by Emporium in its operation of the millinery department was selected by Davison; all Emporium's sales were conducted in Davison's name and the cash resulting was run through Davison's cash registers; Davison furnished all utilities, janitor service, fixtures and building maintenance; the conduct of Emporium's business was subject to Davison's rules and regulations; Emporium was responsible for its employees' salaries; Emporium paid for fire, workmen's compensation and liabil-

---

4. An exhibit elicited by plaintiff in response to a pre-trial request for admissions contains this typical K–Mart ad: "WE'RE A ONE-SHOP STOPPING CENTER.

"It takes a lot, sometimes, to please a large family, but K–Mart does it. In one shop. Garden supplies for the home. Clothes for everyone. Fishing gear for a young sportsman. A doll for your littlest girl. And a snack for the whole family. You'll find nearly all of your favorite brands under one roof at K–Mart . . . with acres of free up-front parking.

" . . . That's why . . .

"YOU'RE SAFE WHEN YOU SAVE AT K–MART."

ity insurance and all taxes on its own operations; Emporium reimbursed Davison for advertising; the millinery department was not separated by partition or otherwise from the other departments in the store; and, as the court said, "The whole public conduct of the business was in the name of Davison's, including advertising and window displays".[5]

On these facts the South Carolina court held that the sale of millinery was a part of the trade, business and occupation of Davison and that the exclusive remedy of Emporium's injured employee was under the Workmen's Compensation Act. The judgment she had obtained against Davison in her common law action was reversed.

■ In reaching this result the court relied on its earlier decision in Marchbanks v. Duke Power Company, 190 S.C. 336, 2 S.E.2d 825 (1939), which was described as "our first and leading case upon the construction and application of the subject statute". In that case the plaintiff stressed, as does the plaintiff here, the absence of those elements of control necessary to establish the common law relationship of master and servant between the plaintiff and the defendant owner. It was contended that such relationship does not exist where an employee is working for an independ-ent contractor who is performing work for the owner. The short answer given by the court to this argument was that if the common law relationship of master and servant existed, the plaintiff would be entitled to compensation under the general provisions of the Act independently of the provisions of the owner liability statute (Section 72–111 of the S.C. Code) which would then serve no useful purpose.[6] Suffice it to say that no South Carolina case has been found involving this statute in which an owner's liability either for payment of compensation or tort damages has been made to rest upon the degree of control retained by the owner over the injured employee of a subcontractor. On the contrary, once it is established that the work being done by the subcontractor is a part of the owner's general business, the employees of the subcontractor become statutory employees of the owner even though their immediate employer is an independent contractor. Bridges v. Wyandotte Worsted Company, 243 S.C. 1, 132 S.E.2d 18 (1963). See also MacMullen v. South Carolina Electric & Gas Co., 312 F.2d 662 (4th Cir.1963) where Judge Boreman reviews and analyzes the prior South Carolina cases on this question.

■ The primary basis for plaintiff's argument that Kraft's millinery busi-

---

5. In her effort to distinguish the *Adams* case plaintiff points to certain differences between the license agreements in the two cases, e. g., absence of agreement for a minimum rental to be paid by Emporium under the Davison agreement; absence of explicit right of Emporium to participate in the initial selection of the size and location of the millinery department; Davison's explicit reservation of the right to approve employees hired by Emporium; that Emporium's employee (plaintiff in that action) "considered herself to be an employee of defendant (Davison)"; and that Davison absorbed losses on uncollectible accounts for millinery. We do not feel these differences are significant in the determination of the ultimate question involved in each of the two cases.

6. In the instant case there was frequent mention during the argument on plain-tiff's motion in the District Court of the fact that K–Mart "had nothing to do with the hiring, the firing, the paying or control over any employee of the licensee". In view of the provisions of the license agreement subjecting Kraft to K–Mart's rules and regulations "governing but not limited to . . . employment practices, personnel and store policies" (see No. 10, Footnote 3, supra), the factual basis for plaintiff's argument is open to question. However, the District Judge, fully cognizant of the South Carolina decisions, did not ground his ruling on the absence of a master-servant relationship, but rather considered the evidence on this point an indication of the separability of the Kraft and K–Mart businesses.

ness was not a part of the "trade, business or occupation" of K–Mart is that K–Mart had never been engaged in the millinery business. Plaintiff points to the fact that K–Mart had no millinery department of its own in any of its 88 stores—that in 85 of them the department was leased to Kraft and that in the remaining three stores there were no millinery departments.[7]

But the inquiry here is not whether K–Mart as owner was engaged in the millinery business or had ever been, but whether Kraft's millinery business was a part of the business of K–Mart which was that of operating a department store.[8] Boseman v. Pacific Mills, 193 S. C. 479, 8 S.E.2d 878 (1940). See also Kennerly v. Ocmulgee Lumber Company, 206 S.C. 481, 34 S.E.2d 792 (1945); Hopkins v. Darlington Veneer Company, 208 S.C. 307, 38 S.E.2d 4 (1946). Indeed it may be inferred that K–Mart had no desire to engage directly in the business of selling ladies' hats and handbags in any of its stores. But if it was to provide, as its ads proclaimed, "clothes for everyone" in a "one-shop stopping center", inevitably these integral items of feminine finery had to be made avail-

able to its lady customers. K–Mart's arrangement with Kraft, whose business apparently was limited to millinery and handbags, was the method chosen to carry on this part of its business. And, as we have seen, in South Carolina it is held that a millinery department operated in a general retail department store by a licensee under terms not materially different from those here involved is a part of the trade, business or occupation of the department store owner within the purview of the statute, Section 72–111. In turn the owner by reason of Section 72–121 is immune to tort liability to the licensee's employees for injuries sustained in the course and scope of their omployment.[9]

The decisions in this Circuit are in accord: Turnage v. Northern Virginia Steel Corp., 336 F.2d 837 (4th Cir. 1964); Evans v. Newport News Shipbuilding & Drydock Co., 361 F.2d 364 (4th Cir.1966). The fact that these cases involve an application of Virginia law does not detract from their authority, for the comparable workmen's compensation statute in that state, Section 65.1–29 of the Code of Virginia (formerly

---

7. K–Mart's witness attributed this to space limitations in these three stores.

8. "Practically all of the cases of general interest interpreting this type of statute are addressed to one question: When is the subcontracted work part of the regular business of the statutory employer? The statutory language lying behind this question varies somewhat; . . . some use the phrase 'any work which is a part of his trade, business or occupation'; . . . But, with a surprising degree of harmony, the cases applying these assorted phrases agree upon the general rule-of-thumb that the statute covers all situations in which work is accomplished which this employer, or employers in a similar business, would ordinarily do through employees." 1A Larsen, Workmen's Compensation Law, § 49.12 at 859–60.

9. Adams v. Davison-Paxon Company, 230 S.C. 532, 96 S.E.2d 566 (1957). In this

case Chief Justice Stukes distinguished Stratis v. McLellan Stores Company, 311 Mass. 525, 42 N.E.2d 282, 142 A.L.R.. 1393 (1942), which had held a lunch counter concession in a department store not to be a part of the department store owner's business, saying:

"We think it obvious that the sale of millinery is more a part of the trade, business and occupation (the words of the statute) of a department store such as appellant, than is the sale of food and soft drinks at a lunch counter. This is not to say that the latter may not be such. but surely millinery is more clearly so."

It is interesting to note that the Stratis case was later overruled in Tindall v. Denholm and McKay Co., 347 Mass. 100, 196 N.E.2d 631 (1964), a case remarkably similar on its facts to Adams and the one at bar. The Massachusetts Supreme Judicial Court held the millinery department of a licensee to be a part of the business of the department store owner so as to make the licensee's employee

Section 65–26) is identical with the South Carolina statute, Section 72–111.[10]

Finally, plaintiff insists that in the event it is held that defendant's plea was improperly stricken, she is entitled to have the question of her status as a statutory employee determined by a jury, citing Byrd v. Blue Ridge Rural Electric Cooperative, 356 U.S. 525, 78 S.Ct. 893, 21 L.Ed.2d 953 (1958). This contention is made in the face of the fact that plaintiff's motion to strike the defense was lodged at the close of defendant's evidence without the tender of any rebuttal evidence and on the sole ground that the undisputed evidence showed the plaintiff not to be a statutory employee of K–Mart.[11]

While the implications of the Byrd case have been the subject of much discussion and commentary,[12] the contention made by plaintiff here has been rejected by this court in Walker v. United States Gypsum Co., 270 F.2d 857 (4th Cir.1959), (cert. denied 363 U.S. 805, 80 S.Ct. 1240, 4 L.Ed.2d 1148). In that case Judge Haynsworth in a trenchant analysis of the problem raised by Byrd

held that the plea based on the workmen's compensation statute must be treated as an affirmative defense and if there is no issue of fact genuinely in dispute, the question of employment status is to be determined by the court. Byrd and its sequel, Magenau v. Aetna Freight Lines, Inc., 360 U.S. 273, 79 S. Ct. 1184, 3 L.Ed.2d 1224 (1959), were read not to require submission of the issue to a jury. Indeed this court in a similar context has held that where there is no dispute as to the basic facts, it would be reversible error to submit the question of employment status to a jury. Burriss v. Texaco, Inc., 361 F.2d 169, 174 (4th Cir.1966).

On the uncontradicted evidence here the conclusion is that the plaintiff was barred by the workmen's compensation statutes from maintaining this action and that it was error to strike defendant's plea in bar. It follows that defendant's motion to dismiss made at the close of the evidence should have been allowed.

Reversed and remanded for dismissal.

---

a statutory employee of the owner under the Massachusetts Compensation Act and to relieve the owner from liability to the employee in a common law action.

10. Cases construing similar language in the unemployment compensation statutes have reached the same result. See, for example, Unemployment Compensation Commission v. L. Harvey & Son Co., 227 N.C. 291, 42 S.E.2d 86 (1947) (department store owner held liable for unemployment tax on employees of a leased shoe department). See Annot., 150 A.L.R. 1214 (1944).

11. On the argument in the District Court plaintiff's counsel did state in response to an inquiry from the bench that in the event the motion were denied he had "one very short reply". In this court he stated

that any further evidence would have related to the question of K–Mart's control over Kraft's employees. As previously stated, we do not regard the presence or absence of such control determinative. Additional evidence on this point could only have confirmed what the record already showed. Moreover, it is difficult to envision what other evidence plaintiff might have offered to alter the legal consequences of the written contract and course of dealings between K–Mart and Kraft, and the evidence as to these matters was not in dispute.

12. See Whicher, The Erie Doctrine and the Seventh Amendment: A suggested Resolution of their Conflict, 37 Tex.L. Rev. 549; Note, Seventh Amendment Restrictions on the Erie Doctrine, 43 Minn.L.Rev. 580.