Bobby D. MACK, Plaintiff,

v.

R. C. MOTOR LINES, INC., a corporation, Defendant.

Civ. A. No. 72–1265.

United States District Court,
D. South Carolina,
Columbia Division.

Oct. 16, 1973.

John E. Cheatham, Lexington, S. C., for plaintiff.

Edwin P. Martin, Columbia, S. C., for defendant.

## ORDER

CHAPMAN, District Judge.

This matter is before the Court upon the defendant's motion for summary judgment claiming that the plaintiff's exclusive remedy and relief is under the South Carolina Workmen's Compensation Act (Title 72 Code of Laws of South Carolina 1962, as amended,) and that jurisdiction is vested solely in the Industrial Commission of the State of South Carolina and not in this Court.

Under Rule 56, Federal Rules of Civil Procedure, summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. This Court has had the benefit of several depositions, including the plaintiff's, answers to interrogatories, a copy of an important contract involved, affidavits and also excellent briefs prepared by the attorneys. After giving considerable study through these documents and the applicable statutes and decisions the Court finds that there is no genuine issue of fact as to coverage by the South Carolina Workmen's Compensation law and that summary judgment for the defendant should be entered.

Immediately after the decision of Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) there appeared to be a question as to whether an issue of employment status could be decided by the Court without a jury. However, in Walker v. United States Gypsum Co., 270 F.2d 857 (4th Cir. 1959) Judge Haynsworth cleared the air by deciding that there was no right to a jury trial of facts involved in the determination of a jurisdictional question, and that the matter of employment status and whether jurisdiction was with the Industrial Commission or the Common Law Court was a question:

". . . peculiarly appropriate for summary judgment when there is no genuinely disputed issue of fact. The parties should not be put to a long and expensive trial only to have the court discover at the end that the case should have been brought in another tribunal. Nor should the parties and the public suffer delay and the dislo-

cation which necessarily follow if crowded jury trial dockets are burdened with cases in which there is no triable issue. Rule 56, Fed.Rules Civ. Proc. 28 U.S.C.A. is designed to insure that they need not." At page 860.

The present case involves the issue of the employee status of the plaintiff and whether he is a "statutory employee" of the defendant under 72–111 South Carolina Code of Laws, 1962, a part of the South Carolina Workmen's Compensation Act which provides:

"When any person, in this section and §§ 72–113 and 72–114 referred to as 'owner' undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and §§ 72–113 to 72–116 referred to as a 'subcontractor') for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay any workman employed in the work any compensation under this Title which he would have been liable to pay if the workman had been immediately employed by him."

If the plaintiff was at the time of his injuries on December 3, 1970 an employee of R. C. Motor Lines, Inc., as a result of section 72–111, then section 72–121 of the South Carolina law comes into play and restricts his remedy to the provisions of the South Carolina Workmen's Compensation Act. Section 72–121 provides:

"The rights and remedies granted by this Title to an employee when he and his employer have accepted the provisions of this Title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account

of such injury, loss of service or death."

These sections of the Workmen's Compensation Act have been the subject of repeated litigation and numerous cases have been decided by both the Fourth Circuit Court of Appeals and the Supreme Court of South Carolina, which are quite helpful to lower courts faced with this question, but unfortunately none of the cases involve facts identical to those now presented. The leading case in South Carolina is Marchbanks v. Duke Power Co., 190 S.C. 336, 2 S.E.2d 825 (1939) which involves the claim of an employee of one who was employed by the power company to paint the power company's poles, and was injured. The Court found that the maintenance of the power company's transmission lines was an important part of its trade or business and such employee was engaged in the trade, business or occupation of the power company and could not maintain a common law action against it, but was restricted to the provisions of the Workmen's Compensation Act.

*Marchbanks* also pointed out that since there were many different factual situations, each case must be determined on its own facts and no general rule or easily applied formula could be laid down for the determination of whether or not the work in any given case was a part of the general trade, business or occupation of the principal employer, contractor or owner.

■ As pointed out in Bridges v. Wyandotte Worsted Co., 243 S.C. pg. 1, 132 S.E.2d pg. 18 (1963):

"It is especially difficult to lay down any hard and fast rule with regard to such activities as repair and maintenance. The practices of different concerns operating in the same field often vary. For example, activities which would be unusual and out of the ordinary in a small business might be a normal activity for a large concern. As stated by Mr. Larson in Section 49.12, page 726, of his work on Workmen's Compensation Law, 'the test

must be relative, not absolute, since a job of construction or repair which would be a non-recurring and extraordinary undertaking for a small business might well for a large plant be routine activity which it normally expects to cope with through its own staff.' Therefore, it is generally recognized that, a statute, such as here under consideration, includes work or activities usually or customarily performed by the owner or principal employer in carrying on the general trade or business."

*Wyandotte* further expresses the interrelation of § 72–111 and 72–121 in the following paragraph found at page 22:

"In determining whether an employee falls within the coverage afforded by Section 72–111, the basic test is whether or not the work being done is a part of the general trade, business or occupation of the owner. Once it is established that the work being done by the subcontractor was a part of the general business of the owner within the meaning of Section 72–111, even though the subcontractor might occupy the status of an independent contractor, the employees of the subcontractor so engaged are limited under Section 72–121 of the 1962 Code of Laws to the exclusive remedy of Workmen's Compensation Laws. Marchbanks v. Duke Power Co., 190 S.C. 532, 2 S.E.2d 825; Adams v. Davison-Paxon Co., supra, 230 S.C. 532, 96 S.E.2d 566, and cases therein cited; Bell v. South Carolina Electric & Gas Co., 234 S.C. 577, 109 S.E.2d 441."

With these basic rules in mind the Court now turns to the facts presented by the present case. In April 1969 the defendant R. C. Motor Lines, Inc. entered into a tire leasing agreement with Tyre Leasing Corp. whereby it agreed for a period of three years to lease the tires and tubes used by it on its tractors (but not its trailers) from Tyre Leasing. During the term of this lease the tire equipment remained the property of Tyre and the defendant had certain rights to purchase the tires at the conclusion of the lease term. The rent on the tires under the lease was figured on a per mile basis and additional rents were due if the air pressure within the tires was not maintained at a certain level.

This was known as a "non-service lease" since it contained the following provision:

"1.04 SERVICING OF TIRE EQUIPMENT

Lessee (defendant herein) agrees to inspect and service the tire equipment regularly and to maintain air pressure at the level recommended by lessor, (per exhibit B) to keep tires matched as to wear and otherwise to follow all the approved practices for maintaining tires and extending tire life, including without limitation keeping the wheels on its vehicles in alignment and the brakes adjusted. Lessee will return to lessor at lessee's expense any tire which needs repair and/or is no longer in proper running condition, and lessor will either retread, repair or renovex said tire and return it to lessee, or shall replace it with a new tire, depending upon which course is, in lessor's sole judgment, the best one to follow. The cost of retread, repair, renovex or replacement shall be borne by lessor or lessee in accordance with provisions of paragraph 3.02 of this lease. Lessee at its expense will mount and dismount tires from rims when it is necessary by either lessee or lessor. Lessee will make all wheel changes and will enclose sufficient space in its garage area for storage and care of the tire equipment without cost to lessor, and will permit lessor's authorized representatives to make inspections of the tire equipment and storage at all reasonable times."

Shortly after this agreement was reached, Tyre employed the plaintiff Bobby D. Mack as its field representative with R. C. Motor Lines. The plain-

tiff testified by deposition regarding his duties and job description:

"At this point I was a field representative for Tyre Leasing Company with R. C. Motor Lines, strictly with R. C. Motor Lines.

Q. So you were hired to do that particular job at that time?

A. Well, it turned out to be that way, right; to be responsible for R. C. Motor Lines tires, the equipment as far as the tires on the equipment, stock tires and whatever they needed in the line of tires, I was the man to do it."

When the lease became effective Tyre placed a small office type trailer and two large storage trailers on defendant's property at its Columbia, South Carolina terminal. The office was used by the plaintiff and the storage trailers were used for tires received from Tyre prior to delivery to R. C. Motor Lines and also for storing used tires before and after they were shipped to Tyre's Tampa, Florida plant for recapping.

When new tires were received, they would be placed in the storage trailers and branded with an imprint showing Tyre's ownership and stock number and after a proper inventory had been made by plaintiff and checked by defendant's tire manager, Frank Shealy, said tires were released to defendant and stored in its tire storage bin until needed on one of defendant's tractors. When recapped or retreaded tires were received by the plaintiff, these would be inventoried, the inventory checked by Shealy and then placed in defendant's storage area. Occasionally due to a shortage of storage space, tires were stored in one of the two Tyre trailers, after they had been inventoried and approved by Shealy and released to defendant. Approximately 30 new tires were kept in the defendant's storage bins and 150 to 200 recaps.

The plaintiff worked closely with Frank Shealy in anticipating the tire needs of defendant and insuring that there was always two or three weeks inventory of tires available at the Columbia terminal.

The plaintiff also checked the condition of the tires on the various tractors of defendant and recommended to Shealy when the tires should be changed, rotated or serviced. New tires were always used on the front wheels and recaps of matching tread were used on the rear. Tyre furnished hubodometers which were placed on each truck and these were read from time to time by plaintiff to determine the mileage. Plaintiff also inspected tires for inflation or air pressure and reported this together with the mileage to his company in order that lease payments could be determined. Plaintiff also kept tire mileage records which indicated when the tires were put into service, when they were put on a piece of equipment and when they were moved or rotated, when they were removed for retread, when they were shipped to Tampa for retreading, when they returned to the terminal and when the tires went back on to operating equipment. From these records he made recommendations as to changes and rotation of tires. He kept a running inventory record of all tires that he had on hand. After plaintiff assumed his duties, the defendant ceased to keep complete inventory records of tires used on its tractors, although it still maintained a card index on tires leased and a tire department for handling the tire equipment on its trailers. The persons in this department also removed, rotated and otherwise handled the tires on the tractors. Plaintiff did not have the authority to direct these employees of defendant, but his suggestions were made to Shealy, who directed that they be carried out by defendant's employees.

As a result of plaintiff taking over these duties as to the record keeping, ordering, control of inventory, inspection, and recommendations regarding the use of defendant's tractor tires, defendant was able to transfer one man out of this department to other duties. Prior to the contract with Tyre the defendant had purchased its tire equipment, kept

inventory records, anticipated needs, inspected and made decisions regarding rotation. At the conclusion of the contract in 1972, it was not renewed and these duties were again assumed by defendant's employee Shealy.

Although plaintiff had the right to and did set his own work hours, the testimony shows that he usually worked the normal work hours and the customary work week. He reported to the President of Tyre, who looked not so much to the hours or days he might work, but to the end result accomplished. From time to time the plaintiff would employ one or two persons on a short term basis to assist him in moving tires, loading or unloading tires or handling a large inventory. However, he did not have the right to hire any permanent employees and did not have the right to order or direct any of defendant's employees to perform a certain task. He was paid a straight salary by Tyre and although there were discussions about being paid for lining up other customers on the same type lease arrangement, the testimony shows that plaintiff never procured another customer or received any compensation in connection therewith.

In addition to the records kept by plaintiff the defendant was required to advise Tyre of the mileage consumed by each vehicle covered by the contract as reflected from the motor lines manifest. These figures were checked at certain intervals against the hubodometers, and the lease contained a provision for adjusting rent where there was a discrepancy between the manifest and the hubodometer.

The defendant is an interstate trucking company engaged in both long haul and short haul business. Its principal place of business is in Jacksonville, Florida, but it maintains terminals in other states, including the one in Columbia, South Carolina. Its operating revenues are in excess of twenty million dollars annually, according to answers to interrogatories. The contract between defendant and Tyre was not renewed because it did not prove to be to the economic advantage of defendant. It was originally entered into with the thought that large capital expenditures for tire equipment could be reduced and financial planning implemented by the lease of tire equipment. This plan represented a change in the defendant's handling of such equipment and presents the Court with the basic question of this case as to whether or not the obligations undertaken by Tyre under the lease were a part of the trade, business or occupation of R. C. Motor Lines, Inc.

The basic facts as outlined above are not in dispute, and the problem arises from the legal interpretation to be drawn therefrom. It is not necessary to discuss in any detail the facts surrounding the plaintiff's injuries except to say that he was injured at defendant's Columbia terminal while assisting a driver of defendant in coupling a tractor to a trailer, in order to move the trailer away from one of the storage trailers provided by Tyre, in order that the doors of the storage trailer might be closed.

As mentioned above, the question of "statutory employees" has been the subject of much litigation and Judge Borman in *MacMullen v. South Carolina Electric & Gas*, 312 F.2d 662 (4th Cir. 1963) discusses most of the decisions of that court and of the South Carolina Supreme Court on the subject. In *MacMullen* the Court found that an injured employee of a subcontractor providing a portion of the control system for the power company's coal-handling operation in its new generating plant was a "statutory employee" and his remedy was under the Workmen's Compensation Act and not at common law. This was based upon the finding that the construction of new additions to its power generating facilities was in the trade and business of the power company, and the controls on the coal-handling equipment was essential to the supply of coal as fuel for the production of steam and the generation of electric power. In Boseman v. Pacific Mills, 193 S.C. 479, 8 S.E.2d 878 (1940) the Court held that the employee

of an independent contractor painting a water tank maintained by the mill for fire protection was an integral part of the mill's business and therefore a part of its trade business and occupation.

In Bell v. South Carolina Electric & Gas, 234 S.Ct. 577, 109 S.E.2d 441 (1959) the Court sustained a demurrer by the power company in a suit brought by the estate of a man, employed by a subcontractor to transfer lines of the power company from one set of poles to the other, finding that the repair and maintenance of the poles and wires or the transferring of such from one set of poles to another was a part of the trade, business and occupation of the company.

In 1972 the Fourth Circuit decided the case of Corollo v. S. S. Kresge Co., 456 F.2d 306, which was based on Adams v. Davison-Paxon Co., supra, which held that the operator of a large retail department store occupied the status of a statutory employer in relation to employees of a company which had leased space in the department store for the operation of a millinery department. In Corollo and Adams both plaintiffs were employees of companies which had licensed from the store owner the operation of a certain department. In these cases there was no sign or other indication that this department was owned by someone else, but in each case the licensee paid the employees' salaries, provided its own products for sale and maintained Workmen's Compensation and other forms of insurance. In Adams the South Carolina Supreme Court held that the sale of millinery was a part of the trade, business and occupation of Davison and the exclusive remedy of the licensee's injured employee was under the Workmen's Compensation Act. A similar holding was made by the Fourth Circuit in Corollo.

■ The present case does not involve a retail establishment and there was testimony that Tyre signs appeared on at least one of the trailers parked at the terminal. However, the acquisition, by lease or purchase, the rotation, changing, cross-changing, inventorying and use of tires was a part of the trade, business and occupation of R. C. Motor Lines. Certainly as important to the motor lines as the transmission lines in Marchbanks or Wyandotte, or the control equipment in MacMullen.

■ Corollo also answers the question of supervision or control, or lack thereof, by the defendant over a statutory employee. At page 311 it is stated:

"Suffice it to say that no South Carolina case has been found involving this statute in which an owner's liability either for payment of compensation or tort damages has been made to rest upon the degree of control retained by the owner over the injured employee of a subcontractor. On the contrary, once it is established that the work being done by the subcontractor is a part of the owner's general business, the employees of the subcontractor become statutory employees of the owner even though their immediate employer is an independent contractor."

■ The plaintiff raises the question that even if he be an employee of the defendant, he would only be a casual employee and not subject to the Workmen's Compensation Act, since he was engaged in helping move a truck, which was not his normal activity. This question is answered in MacMullen and also by the fact that the accident occurred while plaintiff was assisting in moving a trailer which blocked the closing of the doors on his storage trailer.

The plaintiff relies heavily upon a recent decision of the South Carolina Supreme Court, Wilson v. Daniel International Corporation, decided June 21, 1973, S.C., 197 S.E.2d 686. In this case the Court held that a supplier of Ready-Mix Concrete to a construction site where Daniel was the general contractor represented a relationship of "seller and

purchaser" and not of general contractor and subcontractor. The Court found that an employee of the concrete company injured while making a delivery to the construction site by the alleged negligence of a Daniel employee, could sue Daniel at common law since his employer was an independent vendor of Ready-Mix Concrete. The Court cited cases from Virginia, Florida and Colorado which had already decided the issue that a supplier of Ready-Mix Concrete is not a subcontractor but a vendor.

*Wilson* is distinguishable on a number of points. First, there are decisions from other parts of the country, relied upon by the South Carolina court, that Ready-Mix Concrete suppliers are vendors and not subcontractors. Some of these are based upon the peculiar properties of Ready-Mix Concrete. Second, Wilson was shown to have made only one trip to the construction site, while Bobby Mack, the present plaintiff, worked continuously at defendant's terminal for approximately three years. Wilson dispensed the concrete from the back of his mixer at the place indicated by the general contractor, but Mack performed numerous and continuing services on an almost day to day basis, working in close cooperation with defendant's tire manager Shealy. Mack did not come to the defendant's terminal, brand and deliver the tires and then leave, but he stayed performing numerous duties that had previously been performed by employees of the trucking company and were subsequently performed after the end of the lease.

Based upon the facts as hereinabove set forth and the cases cited, the Court can only conclude that Bobby D. Mack was a "statutory employee" of the defendant and was performing a part of the defendant's trade, business or occupation under Section 72–111, South Carolina Code and is therefore restricted by Section 72–121 from proceeding against the defendant in the present action. The defendant is entitled to summary judgment in this matter.

And it is so ordered.